# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | |
|---|---|
| **BETEIRO, LLC,** | |
| Plaintiff | **Case No. 6:21-cv-01149** |
| v. | **JURY TRIAL DEMANDED** |
| **MORRIS MOHAWK GAMING GROUP,** | |
| Defendant | |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Beteiro, LLC ("Plaintiff") hereby files this Original Complaint for Patent Infringement against Morris Mohawk Gaming Group ("MMGG" or "Defendant"), and alleges, upon information and belief, as follows:

## THE PARTIES

1.     Beteiro, LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at 600 S. Dixie Highway, Suite 605, West Palm Beach, Florida 33401.

2.     Upon information and belief, Defendant MMGG is a private company organized and existing under the laws of Canada, with a place of business in the Kahnawake Mohawk Territory, at the Kahnawake Office Complex, Kahnawake, Quebec, J0L1B0, and can be served through its agent, Alwyn Morris at the Kahnawake Office Complex, Kahnawake, Québec J0L1B0 Canada.  Upon information and belief, MMGG distributes, makes, uses, makes available, promotes, sells, offers to sell, and generates substantial revenues from products and services throughout the United

States, including but not limited to the Internet domain registered and existing at www.bovado.lv.

## **JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a).

4.      This Court has specific personal jurisdiction over Defendant.  On information and belief, Defendant has continuous and systematic business contacts with the United States generally, including but not limited to the ownership, operation, and promotion of infringing Internet gambling domains and Mobile Wagering Platforms as identified herein.  Moreover, on information and belief, Defendant generates substantial revenues from "hundreds of thousands" of consumers across the United States from its infringing Mobile Wagering Platforms. Defendant's activities and business connections in the United States are extensive, such that the maintenance of this suit in this District does not offend traditional notions of due process, fair play, and substantial justice.



*See https://www.bovada.lv/about.*

Bovada.lv is a new online gambling site powered by Bodog. They are owned by Mohawk Morris Gaming Group (MMGG) who has been licensing Bodog software, brand name, and support services since 2007. With Bodog now growing in legal markets, they no longer want for their brand name associated with United States gambling. As a result, the new Bovada.lv brand was created on December 14, 2011 for US players, while non-US players still use Bodog branded websites. Below, we cover their history in great depth.

*See*
*https://www.gamblingsites.org/history/bovada/?__cf_chl_jschl_tk__=cb974ba15d00b5f6576e5f*
*0a0acca653e8625c54-1625505260-0-*
*AbncdXzXGZGpqGIOeaaom_EcAzRAExZGBRtVmTg7zi11L-O3oOPNiiN-*
*ISX42EQkHQSfASCpBAqZGnmXwQdYcWjpgFdmcrT3hB3_J0Ieqz7lL9uEv3fEUjVnk3KJO3_lk_*
*1GgJwZtQuAC2NDNmJnmTtdUHvzH_jbTdi6N_d9-4Nh0rjmVVGtvxlhv65L-*
*QDj7tRrQQ0nMJjCRj2hpOJexFYri3g77fi-T98uhxEtdJwahl1MiTJS9yfKY9Vo7mDo6RKcI-*
*bO_nkkC6BcsSrC6_2j10djNEI8UVmZHrISDGEBNn9Q0rouOYD-9TyfBW9LJT_jO7t_3oUH-*
*_yqqJrMgQcSsWpTWbDm5hKcOxKcIFgG264_mEWbgvm74HaSN9MTu71Rwl5VTZHsNjjKM2*
*cxEnoCp-VNufqJuEUE3DY2UJXA*



*See https://en.wikipedia.org/wiki/Morris_Mohawk_Gaming_Group.*

5.     On information and belief, MMGG provides gambling and event wagering services, including but not limited to providing and supporting its branded Mobile Wagering Platform, which operate under the "Bovado" brand name and the Internet website located at www.bodavo.lv, which is comprised of hardware (including servers) and software (including source code). On information and belief, such hardware and software are made, used, sold, offered for sale, and

tested on the authority and under the direction of MMGG.  Such branded Mobile Wagering Platform of MMGG is directly accessible to users in the United States through the Internet domains and mobile applications of MMGG.

6.      Venue is proper in the Western District of Texas as to Defendant pursuant to at least 28 U.S.C. §§ 1391(b) and (c) and 1400(b), as well as under the "alien venue rule."  *Brunette Machine Works, Ltd. v. Kockum Indus., Inc.,* 406 U.S. 706 (1972); *In re HTC Corp.,* 889 F.3d 1349 (Fed. Cir. 2018); *Weatherford Tech. v. Tesco Corp.,* 2018 WL 5315206 at *2-3 (E.D. Tex. Oct. 26, 2018).  As noted above, Defendant is a foreign entity which maintains a regular and established business presence in the United States by virtue of its readily-accessible Internet domain, mobile applications, and Mobile Wagering Platform.

## PATENTS-IN-SUIT

7.      Plaintiff is the sole and exclusive owner, by assignment, of U.S. Patent Nos. 9,965,920 ("the '920 Patent"); 10,043,341 ("the '341 Patent"); 10,147,266 ("the '266 Patent"); and 10,255,755 ("the '755 Patent") (hereinafter collectively referred to as "the Beteiro Patents").

8.      By operation of law, the Beteiro Patents were originally issued and exclusively vested to the sole named inventor, Raymond Anthony Joao, as of the date of their respective issuances.  *See* 35 U.S.C. § 261; *Schwendimann v. Arkwright Advanced Coating, Inc.,* 959 F.3d 1065, 1072 (Fed. Cir. 2020); *Suppes v. Katti,* 710 Fed. Appx. 883, 887 (Fed. Cir. 2017); *Taylor v. Taylor Made Plastics, Inc.,* 565 Fed. Appx. 888, 889 (Fed. Cir. 2014).  Mr. Joao, in a written instrument dated March 6, 2012, and filed with the United States Patent and Trademark Office on May 7, 2015 at Reel 035604 and Frames 0126-0132, assigned all rights, title, and interest in the Beteiro Patents to GTJ Ventures, LLC.  Thereafter, in a written instrument dated June 15, 2021, and filed with the United States Patent and Trademark Office on June 16, 2021 at Reel 056566 and Frames

0057-0060, GTJ Ventures assigned all rights, title, and interest in the Beteiro Patents to the Plaintiff, Beteiro, LLC.  As such, Plaintiff Beteiro LLC has sole and exclusive standing to assert the Beteiro Patents and to bring these causes of action.

9.     The Beteiro Patents are valid, enforceable, and were duly issued in full compliance with Title 35 of the United States Code.

10.    The inventions described and claimed in the Beteiro Patents were invented individually and independently by Raymond Anthony Joao.

11.    Mr. Joao is a prolific inventor, with more than 80 issued United States Patents to his credit.  The Beteiro Patents represent substantial advancements in the gambling industry which were unconventional at the time of invention.  In fact, Mr. Joao is extremely knowledgeable in the field, having earned: (i) a Masters Degree in Sports Management from Columbia University (New York); and (ii) a Masters Degree in Global Sports Law from Instituto Superior de Derecho y Economia (Madrid, Spain).

12.    The Beteiro Patents each include numerous claims defining distinct inventions.

13.    The priority date of each of the Beteiro Patents is at least as early as May 31, 2002.  As of the priority date, the inventions as claimed were novel, non-obvious, unconventional, and non-routine.  Among other things, as of the priority date, the mobile gaming industry was essentially non-existent.  The first mobile gaming venture to launch internationally did not arise until 2003 in the United Kingdom, and that in the form of an elementary interactive instant win game.  *See, e.g.,       https://www.gamblingcommission.gov.uk/for-the-public/National-Lottery/About-the-National-Lottery.aspx.*  The concept of geolocation restrictions on such gaming platforms was not routine as of the priority date, and did not become so until many years thereafter.  Indeed, it was not until 2006 that the Nevada Gaming Control Board first cleared the way for wireless

gambling in the United States.  Even at that time, the primary concern was over data security and identity controls, not geolocation *See https://www.nytimes.com/2006/05/03/technology/techspecial3/03gamble. html?smid=url-share.*

14.    As further evidence of the non-routine and unconventional nature of the solutions captured in the Beteiro Patents is the stated position of the now-leading geolocation provider in the United States that: "Historically, the notion that you could indeed draw geographical boundaries on the internet would have been laughable; such was the weakness of the original technologies and the availability of cheap and easy methods to fake your location online." *See https://www.geocomply.com/paspa-geolocation-compliance/.*  As such, the prevailing view as of the date of invention was to avoid global positioning as a means of legal compliance.

15.    As further evidence of the stated non-routine aspects of the inventions, during prosecution of the '920 Patent, Primary Examiner Jasson Yoo specifically and expressly considered whether the claims of the '920 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular receiver for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS.  *See* Notice of Allowability, dated March 16, 2018.

16.    As further evidence of the stated non-routine aspects of the inventions, during prosecution of the '341 Patent, Primary Examiner Jasson Yoo specifically and expressly considered whether the

claims of the '341 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*. Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular machine or processor for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS. *See* Notice of Allowability, dated June 11, 2018.

17.     As further evidence of the stated non-routine aspects of the inventions, during prosecution of the '266 Patent, Primary Examiner Jasson Yoo specifically and expressly considered whether the claims of the '266 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*. Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular machine or processor for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS. *See* Notice of Allowability, dated June 11, 2018.

18.     As further evidence of the stated non-routine aspects of the inventions, during prosecution of Application No. 16/939,030, Primary Examiner Jasson Yoo specifically and expressly considered whether the then-pending claims were eligible under 35 USC §101 in view of the

United States Supreme Court's decision in *Alice*.   Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims integrate the invention into a practical application by providing an improvement to a technical field; (ii) all claims provide an improvement to a technical field by allowing individuals to access gaming or gambling venues and/or activities without requiring them to be physically located at gaming or gambling venues and/or activities; (iii) all claims provide individuals with information regarding the gaming or gambling venues so that bets can be placed from a remote location; (iv) all claims achieve the stated benefits by: (a) detecting a posting of information regarding a gaming activity, gambling activity or sporting event, and (b) generating a notification message regarding the gaming activity, gambling activity or sporting event; (v) in all claims a global position device is used to determine a position or location information of a communication device associated with the individual, and allowing or disallowing the activity request or bet based on the position or location information; as such, the claimed machine is required and imposes a meaningful limit on the scope of a claim and plays a significant part in permitting the claimed method to be performed; (vi) at the time the application was filed, the use of global positioning systems for various applications and providing a user a message if a posting was detected were not as well-known as today; in fact, and as indicated in the specification, prior art systems failed to provide a system that allows individuals access to particular gaming venues or gaming activities, and did not provide individuals certain information for enhancing their experience; and (vii) the claimed invention provides an improvement to online betting and therefore is integrated into a practical application.  *See* Notice of Allowability, dated October 27, 2021.

19.     Plaintiff alleges infringement on the part of Defendant of the '920 Patent, the '341 Patent, the '266 Patent, and the '755 Patent (collectively as the "Asserted Patents").

20.     The '920 Patent relates generally to an apparatus, including a processor, specially programmed to detect a posting of information regarding a sporting event for which a bet can be placed, which detects the posting regarding the sporting event and generates a notification message containing information regarding the sporting event.  The apparatus initiates a communication link with a first user communication device and transmits the notification message to the first user communication device via the communication link; a receiver which receives a bet message, containing information regarding a bet on or regarding the sporting event, transmitted from the first user communication device or a second user communication device; and a transmitter.  The apparatus or processor processes information for placing the bet and the transmitter transmits video information or audio information regarding, and obtained at, the sporting event to the first user communication device, the second user communication device, or a third user communication device.  *See* Abstract, '920 Patent.

21.     The '341 Patent relates generally to an apparatus, including a computer including a processor which detects a posting of information regarding a gaming activity, gambling activity, or sporting event, and generates the notification message.  The computer initiates a communication link with a first device and transmits the notification message to the first device.  The computer receives a bet message transmitted from the first device or from a second device.  The first device or second communication device includes a global positioning device and a display.  The bet message contains information regarding a bet to be placed and information regarding the position or location of the first device or second device at a time of a transmission of the bet

message.  The computer determines if the bet is allowed or disallowed using position or location

information of the first device or the second device.  *See* Abstract, '341 Patent.

22.     The '266 Patent relates generally to an apparatus, including a computer.  The computer detects a

posting of information regarding a gaming activity, gambling activity, or sporting event, and

generates a notification message.  The computer initiates a communication link with, and

transmits the notification message to, a first communication device, or the computer transmits

the notification message as an electronic mail message which is received by a first

communication device.  The computer receives a bet message transmitted from the first

communication device or a second communication device. The first communication device or

second communication device includes a global positioning device which determines a position

or location of the first communication device or second communication device.  The computer

determines if the bet is allowed or disallowed using the position or location information.  If

allowed, the computer processes information for placing the bet.  If disallowed, the computer

processes information for disallowing the bet.  *See* Abstract, '266 Patent.

23.     The '755 Patent relates generally to a method and apparatus, including: detecting, with a

computer, a posting of information regarding a gaming activity, gambling activity, or sporting

event; generating a notification message regarding the same; initiating a communication link

with, and transmitting the notification message to, a first communication device as an electronic

transmission, or transmitting the notification message as an electronic mail message; receiving a

bet message transmitted from the first communication device or a second communication device,

wherein the first communication device or the second communication device comprises a global

positioning device which determines a position or location of the first communication device or

second communication device, wherein the bet message contains information regarding a bet to

be placed regarding the activity or event, and information regarding the position or location of the first communication device or second communication device; and determining whether the bet is allowed or disallowed using the position or location information.  *See* Abstract, '755 Patent.

24. As noted, the claims of the Asserted Patents have priority to at least May 31, 2002.  At that time, the use of geolocation and global positioning as an integral data point in the processing of mobile wagers was still many years away.  For example, the first GPS chip to be incorporated into a mobile device with sufficient sensitivity to assess the ability of an individual to place a wager in a given jurisdiction was the GL20000 GPS Chip, which was first used in the HP iPaq in 2005.

25. Still further, the current industry leader in the space – GeoComply – did not even exist until 2011, nearly a full decade later than the nominal date of invention in May 2002.  *See, e.g., https://www.geocomply.com/about-us/.*  This fact alone is compelling evidence of the non-routine and unconventional inventive concepts captured in the claims of the Beteiro Patents.

26. The claims of the Asserted Patents are not drawn to laws of nature, natural phenomena, or abstract ideas.  Although the systems and methods claimed in the Asserted Patents are ubiquitous now (and, as a result, are widely infringed), the specific combinations of elements, as recited in the claims, were not conventional or routine at the time of the invention.

27. Further, the claims of the Asserted Patents contain inventive concepts which transform the underlying non-abstract aspects of the claims into patent-eligible subject matter.

28. Consequently, the claims of the Asserted Patents recite apparatuses and methods resulting in improved functionality of the claimed systems and represent technological improvements to the operation of computers.  The claims of the Asserted Patents provide a basis for legally compliant remote wagering, increased accessibility to wagering platforms, increased opportunity for

wagering providers, increased accessibility to wagering information to wagerers, reduced fraud, and more secure transactions among wagering providers and wagerers.  *See, e.g.,* '920 Patent at 2:5-7:58.

29.   The claims of the Asserted Patents overcome deficiencies existing in the art as of the date of invention, and comprise non-conventional approaches that transform the inventions as claimed into substantially more than mere abstract ideas.  For example, as of the date of invention, "[w]hile many individuals enjoy gambling and/or enjoy engaging in gaming activities and/or gambling activities, they may not always have access to particular gaming venues or gaming activities.  Further, while many individuals may also be interested in making a gaming and/or gambling experience more interesting, more challenging, and/or more exciting, they typically do not have access to certain information, products, and/or services, for enhancing their experience or experiences." '920 Patent at 1:44-52.  The inventions as claimed overcome these deficiencies in the state of the art, and provide a means by which interested parties can access gambling services remotely, while preserving geographic restrictions on such access.  As explained, as of the date of invention, "prior art gaming systems and/or gambling systems, as well as conventional gaming practices and/or gambling practices, have failed to provide the gaming community with services, products, and/or other offerings, which would provide for more enhanced gaming and/or gambling activities, environments, and/or experiences." '920 Patent at 1:53-58.

30.   As of the date of invention (and still today), different jurisdictions had different laws relating to gambling activities, but no effective way to administer and regulate electronic and online wagering.  Accordingly, the inventions as claimed provided a technological solution to the technological problems arising in the online wagering context.  As explained: "The present

invention can be utilized to facilitate compliance with the various and respective state, country, and/or sovereignty, gaming laws and/or gambling laws and/or so as to facilitate any reporting of gaming activities and/or gambling activities to the appropriate state, country, and/or sovereignty, authorities and/or so as to facilitate any payments of fees and/or taxes relating to the gaming activities and/or gambling activities." '920 Patent at 16:14-21.   Indeed, one of the express objects of the inventions as claimed was "to provide an apparatus and method for facilitating gaming activity and/or gambling activity which utilize global positioning technology in order to ascertain the jurisdiction in which or from which a bet is placed." '920 Patent at 26:14-18.   Such a solution was unconventional as of the date of invention, especially in view of the state of the art at the time, which was dependent upon in-person wagering.

31.     The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by providing a means by which gambling platform providers could more effectively market various gaming activities to wider audiences.   As explained, the inventions as claimed overcome these deficiencies by "allow[ing] a user or player to access a central processing computer and search for a gaming activity, gaming activities, a gaming event, or gaming events, in which the user or player may desire to bet or participate." '920 Patent at 32:6-10.   As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day by making it possible to expose more individuals to the various gaming options available in the market.

32.     The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by providing methods and apparatuses for providing wagering opportunities on an increased scale over traditional person-to-person live wagering.   As explained, the inventions as claimed overcome prior deficiencies in this regard because "the apparatus 100 also includes any

number of user computers or user communication devices 20." '920 Patent at 35:65-67.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the wagering platform providers can maximize the number of wagers made without a proportional increase in overhead, wagering equipment/terminals, or employee capacity.

33.   As noted, as of the date of invention (and still today), different jurisdictions had different laws relating to gambling activities, but no effective way to administer and regulate electronic and online wagering.  A key problem as of the date of invention was the inability of wagering platform providers to geographically restrict access by remote participants.  Accordingly, the inventions as claimed provided a technological solution to the technological problems arising in the online wagering context by unconventionally adapting the mobile devices used by wagering participants so as to create new mobile gaming machines.  As explained: "[T]he user communication device 20 can also include a global positioning device 20J for determining the position or location of the user communication device 20.  In a preferred embodiment, the global positioning device 20J can be utilized to determine the position or location of the user communication device 20 so as to, for example, determine a jurisdiction in which the user communication device 20 is located and/or is being utilized." '920 Patent at 44:37-44.  As such, the inventions as claimed provided non-conventional solutions to the conventional problems of the day.  Indeed, the very infringing scenarios in existence today were contemplated and foreseen by the inventor many years ago: "In another preferred embodiment, wherein the user communication device 20 is a wireless communication device and/or a mobile communication device (*i.e.* personal digital assistant, wireless videophone, wireless telephone, or palm-held device, etc., which can be equipped with a global positioning system (GPS) device 20J), the

location of the user communication device 20 and, therefore, the location from which the gaming activity and/or gambling activity originates and/or from which it takes place can be determined by the user communication device 20 automatically transmitting position data and/or information to the respective central processing computer 10 and/or gaming facility computer 30 at the time of the user's accessing of the respective central processing computer 10 and/or gaming facility computer 30." '920 Patent at 80:10-24.  Again, this scenario was far from conventional as of the date of invention, as evidenced by the fact that the first iPhone was not introduced to the market until 2007, and the common "app-store" did not exist until 2008, many years after the date of invention.                    *https://en.wikipedia.org/wiki/IPhone*                    and *https://en.wikipedia.org/wiki/App_Store_(iOS/iPadOS)*.  Moreover, as of 2002, it was effectively illegal in the United States to even wager on athletic events, much less to do so remotely.  More specifically, the Professional and Amateur Sports Protection Act of 1992 was the federal law in effect from October 1992 until it was declared unconstitutional by the United States Supreme Court in May 2018.  *See Murphy v. National Collegiate Athletics Association,* 138 S.Ct. 1461 (2018).  In view of the prevailing and long-standing laws in the United States, the inventive concepts captured in the claims of the Beteiro Patents were plainly unconventional and non-routine.

34.    As noted, as of the date of invention (and still today), different jurisdictions had different laws relating to gambling activities, but no effective way to administer and regulate electronic and online wagering.  A key problem as of the date of invention was the inability of wagering platform providers to geographically restrict access by remote participants.  Accordingly, the inventions as claimed provided a technological solution to the technological problems arising in the online wagering context by creating unconventional central processing computers specially

programmed to assess the legality of proposed wagers in real-time.  As explained: "At step 2003, the respective central processing computer 10 and/or gaming facility computer 30 can determine if the remote gaming activity and/or gambling activity is allowed by the state having jurisdiction over the remote gaming activity and/or gambling activity.  If, at step 2003, the respective central processing computer 10 and/or gaming facility computer 30 determines that the remote gaming activity and/or gambling activity is disallowed by the identified state having jurisdiction over same, then the operation of the apparatus 100 will proceed to step 2004 and the respective central processing computer 10 and/or gaming facility computer 30 will cancel the respective bet, wager, and/or gaming activity and/or gambling activity." '920 Patent at 80:37-50.  As such, the claimed "central processing computer" does not merely comprise standard conventional hardware and software; rather, as claimed, it advances the functionality of the computer as a useful tool in the electronic processing of wagers, the prevention of illegal gambling, and providing a measure of compliance on the part of wagering platform providers.

35.     As noted above, during prosecution of each of the '920 Patent, the '341 Patent, and the '266 Patent, the Primary Patent Examiner specifically considered whether the claims at issue were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  In each instance, after due consideration, the Primary Patent Examiner expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular machine or processor for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine

whether the bet is allowed or disallowed by using GPS.  The Primary Patent Examiner was, in each instance, correct.  For these same reasons, all of the claims of the Asserted Patents are patent-eligible.

36.     The '920 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '920 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: CPC, A63F 13/00; A63F 9/24; G07F 17/32; G07F 17/3244; G07F 17/3237; G07F 17/3223; and G07F 17/3288.

37.     After conducting a search for prior art during the examination of the '920 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6104815; (ii)  US6113493; (iii) US2002/0002075; (iv) US2002/0054088; (v) US2002/0098829; (vi) US6443841; (vii) US2002/0147049; (viii) US20020183105; and (ix) US6508709.

38.     After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '920 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '920 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '920 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would

have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

39.   The '920 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

40.   The '341 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '341 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G07F 17/3237; G07F 17/3288; G07F 17/3223; G07F 17/3244; and G07F 17/32.

41.   After conducting a search for prior art during the examination of the '341 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6104815; (ii) US9965920; and (iii) 2002/0183105.

42.   After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '341 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '341 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '341 Patent are novel and non-obvious, including

over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

43.   The '341 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

44.   The '266 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '266 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G07F 17/3237; G07F 17/3288; G07F 17/3223; G07F 17/3244; and G07F 17/32.

45.   After conducting a search for prior art during the examination of the '266 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6104815; and (ii) 2002/0183105.

46.   After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '266 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '266 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and

cited prior art.  Likewise, the claims of the '266 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

47.  The '266 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

48.  The '755 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '755 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G07F 17/3237; G07F 17/3288; G07F 17/3223; G07F 17/3244; and G07F 17/32.

49.  After conducting a search for prior art during the examination of the '755 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6106815; and (ii) 2002/0183105.

50.  After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '755 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '755 Patent are novel and non-

obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '755 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

51.    The '755 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

52.    The claims of the Asserted Patents were all properly issued, and are valid and enforceable for the respective terms of their statutory life through expiration, and are enforceable for purposes of seeking damages for past infringement even post-expiration.  *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.,* 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.'  Much to the contrary, a patent does have value beyond its expiration date.  For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286") (internal citations omitted).

53.    The expiration dates of the Beteiro Patents are at least the following: the '920 Patent expires no earlier than May 19, 2023; the '341 Patent expires no earlier than May 19, 2023; the '266 Patent expires no earlier than May 19, 2023; and the '755 Patent expires no earlier than May 19, 2023.

## THE ACCUSED INSTRUMENTALITIES

54.    Upon information and belief, Defendant makes, sells, advertises, offers for sale, uses, or otherwise provides a plurality of gambling and event wagering services, including but not limited

to providing and supporting its branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).  On information and belief, such hardware and software are made, used, sold, offered for sale, and tested on the authority and under the direction of MMGG.  Such branded Mobile Wagering Platform of MMGG is directly accessible to users in the United States through the Internet domains and mobile applications of MMGG.  On information and belief, the MMGG system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of MMGG which collectively operate as a single controlled apparatus to administer the MMGG branded Mobile Wagering Platform in the United States.  On information and belief, the MMGG branded Mobile Wagering Platform offered by MMGG is marketed as the "mobile-friendly" Internet domain: BOVADA.LV (the "MMGG Domains").  Collectively, all of the foregoing comprise the "Accused Instrumentalities."  *See* Figure Group A.



*See https://www.bovada.lv/sports*.

**General Sports and Event Betting Rules**

**1.** All sporting and non-sporting events must take place on the date and at the site scheduled – unless otherwise specified. Time changes within a day do not affect wagers. If an event is postponed, rescheduled and/or relocated before it starts, that event will automatically be graded '**No Action**' and your money will be refunded to your Bovada account.

**2.** For betting purposes, the winner of an event or game will be determined on the date of the event's conclusion, and according to house wagering rules and regulations.

**3.** Bovada does not recognize suspended games, protests or overturned decisions for wagering purposes.

**4.** Team Win Totals (for All Sports and non-sporting events): All Team win totals are for the regular season unless stated otherwise. In the event of a game cancellation that is not replayed during the season, all wagers still have action unless the result of the cancelled game(s) would impact the result. In cases where the unplayed game(s) would have an impact of the result, all wagers will be settled No Action.

**5.** Specials (All Sports): For all wagers in Specials or Entertainment categories, if a prop has no scheduled start date and information can be released that would decide the result of a wager, all wagers placed on the day where the information becomes public knowledge (Eastern Standard Time) will be settled No Action.

*See https://www.bovada.lv/help/sports-faq/general-betting-rules.*

**What is a Single Bet?**

A single bet (sometimes called a straight bet) is a wager on the outcome of a single event or game. Based on the odds you choose, either the outright winner, the point spread, or the combined scores of both teams determines a winning bet. Your payout is determined by the odds posted at the time the bet is placed.

**Quickslip function:**

On your Mobile device, you can place single bets more easily while browsing our lines in the Sportsbook. Simply select your bet, enter the RISK or WIN amount, then click the checkmark to confirm. Parlays, teasers and other complex bet types must be placed on the traditional bet slip.

**How to Place a Single Bet:**

**1.** Log in to your Bovada account and click **SPORTS** at the top of the screen.



**2.** Pick your sport from the menu - click '**All Sports**' to show more. By default, the page will only show open events or those that have lines available for betting.



3. Select your line by clicking the appropriate box with the odds. Your selection will be added to the Bet Slip.

|  | Spread | Win | Total |
|---|---|---|---|
| 2/3/19   6:30 PM   181 > | | | |
| New England Patriots | -3.0 (-110) | -145 | O 57.0 (-110) |
| Los Angeles Rams | +3.0 (-110) | +125 | U 57.0 (-110) |

On your phone, the Bet Slip can be accessed by clicking the icon at the bottom of your window. On Desktop devices, it's located to the right of the betting lines.

Note: For singles bets or to place multiple single bets at once, ensure the Singles Tab is selected at the top of the Bet Slip



4. On the Bet Slip, enter either a Risk or Win amount in the box provided. The total Win or Risk amount is calculated for you.

5. Review the details of your single bet. If you're happy with your selection, proceed by clicking 'Place Bets'. You will be shown a confirmation screen including your wager reference number.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                      24



*See https://www.bovada.lv/help/sports-faq/single-bet.*



*See https://www.bovada.lv/sports/virtual-sports.*

## Basketball

At the time of writing, I've watched 15 consecutive basketball games in the "American Basketball League" though, they admittedly don't take very long to resolve. A new game starts every four minutes.

Each contest shows the simulated players competing in a handful of plays, while announcers call the action. The visual effects are surprisingly well done and feature a wide variety of plays, from deep threes to the occasional "Vince Carter" elbow dunk. After showing a few highlights, Bovada posts the halftime and final scores.

What's brilliant is that there's a real handicapping element to betting on these virtual basketball games. The website has created an entire league, with official standings and stats that appear to impact the results.

*See https://www.legitgamblingsites.com/blog/examining-bovadas-live-numbers-games-and-virtual-sports/*

# Morris Mohawk rebrands in US with Bovada domain

*US residents blocked from Bodog.eu and other Bodog-branded egaming sites as of today.*

**Andy Roocroft** | 14 December 2011



✉ Email    🖨 Print    ⌁ Share

Bodog.eu, the Kahnawake-licensed Bodog brand licensee owned by the Morris Mohawk Gaming Group (MMGG), has closed its doors to customers from the United States. From this afternoon, MMGG will begin operating from the Bovada.lv domain, despite its licensing agreement for the Bodog.eu domain not officially ending until 31 December. Bodog had announced earlier this year...

*See https://egr.global/intel/news/morris_mohawk_rebrands_in_us_with_bovada_domain/.*

To be clear, they don't use an actual native app but instead offer a mobile-responsive website. All this means is that there's nothing for you to download. You access everything from your mobile web browser.

*See https://www.gamblingsites.com/gambling-apps/bovada/.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                              26

**FIGURE GROUP A**

55.     On information and belief, the Accused Instrumentalities collect, process, and utilize location information relative to the specific communication device (*e.g.,* the laptop computer or mobile device) of the MMGG interactive Internet domain and/or mobile application associated with individual users of the MMGG Wagering Platform.  On information and belief, acceptance and use of such location information is a requirement imposed by MMGG on all users of the infringing Accused Instrumentalities in the United States.  *See* Figure Group B.

**2.3.** Use of the website and associated services are expressly prohibited from the following states: DE, MD, NJ, NV & NY. Any account accessed from a restricted state will have all access rights revoked and any balance contained in the account may be considered void. You are required to notify us immediately should you intend to relocate to or visit a restricted state, your account will then be placed on a temporary hold or permanently closed dependant on the circumstance with any balance available being returned to you. Any attempt on your part to circumvent these restrictions by any means will result in your accounts closure and any balance considered forfeit.

**6.2 Fraudulent Activity.** If, in our reasonable discretion, we determine that a player has engaged in fraudulent, unlawful, dishonest or improper activity (including, without limitation, the usage of a VPN, proxy or similar service that masks or manipulates the identification of your real location, or by otherwise providing false or misleading information, or by making bets, wagers or poker play through a third party or on behalf of a third party) we reserve the right to immediately terminate or deny a player access to their Account. In such event, all Account balances (including both deposits and any winnings) shall be forfeited and we reserve the right to disclose information (including the identity of the player) to applicable parties including but not limited to banks, credit card companies and/or any person or entity that has the legal right to such information, and/or taking legal action against such player.

*See https://www.bovada.lv/terms-of-service.*

**INTEGRITY OF SPORT**

Bovada is committed to ensuring the integrity of sport and to participating in efforts to identify and eradicate match fixing. As such, notwithstanding any other term of the Terms of Service, or any provision of the applicable Privacy Policy, by placing a bet or wager on the website, you expressly acknowledge and agree that Bovada at all times reserves the right in its sole discretion to report Irregular Betting Activity to such sports federations, regulators, agencies, commissions or associations (or their respective agents) as Bovada deems appropriate ("Regulatory Bodies") in order to enable identification of irregular activity and to support appropriate investigations. "Irregular Betting Activity" means activity that, in Bovada's sole assessment, deviates from expected betting patterns and includes, without limitation: (i) an unusual and significant number of bets originating from the same geographic region or through linked accounts; (ii) a bettor continuing to place bets at any price in the face of a steady reduction in the applicable odds; and/or (iii) any other indicator or pattern assessed by Bovada as indicative of potential match fixing. Bovada shall use reasonable commercial measures to ensure that any information provided to Regulatory Bodies pursuant to this provision is subject to reasonable contractual non-disclosure provisions, and that all information or documentation shall be destroyed by such Regulatory Bodies when it is no longer relevant in connection with any ongoing investigation, enquiry or disciplinary process.

Last updated: February 22, 2018

*See https://www.bovada.lv/privacy-policy.*

**FIGURE GROUP B**

56.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to one or more of the following: (i) Colorado, as

licensed and regulated by the Colorado Department of Revenue – Division of Gaming; (ii) Illinois, as licensed and regulated by the Illinois Gaming Board; (iii) Indiana, as licensed and regulated by the Indiana Gaming Commission; (iv) Iowa, as licensed and regulated by the Iowa Racing and Gaming Commission; (v) Michigan, as licensed and regulated by the Michigan Gaming Control Board; (vi) New Hampshire, as licensed and regulated by the New Hampshire Lottery Commission; (vii) New Jersey, as licensed and regulated by the New Jersey Division of Gaming Enforcement; (viii) Pennsylvania, as licensed and regulated by the Pennsylvania Gaming Control Board; (ix) Tennessee, as licensed and regulated by the Tennessee Education Lottery Corporation; (x) Virginia, as licensed and regulated by the Virginia Lottery; (xi) West Virginia, as licensed and regulated by the West Virginia Lottery Commission; (xii) Montana, as licensed and regulated by the Montana Lottery; (xiii) Nevada, as licensed and regulated by the Nevada Gaming Commission; (xiv) Oregon, as licensed and regulated by the Oregon Lottery; and (xv) Rhode Island, as licensed and regulated by the Rhode Island Lottery.

57.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to the United States Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367).

58.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to the Colorado Department of Revenue – Enforcement Division, Gaming Sports Industry Bulletin Number 3, dated April 20, 2020.

59.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform

accepts wagers, including but not limited to Section 1900.1430 of Title 11, Section E, Chapter I of the Illinois Administrative Code.

60.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to: (i) Chapter 11 of Indiana Title 68 – Indiana Gaming Commission Emergency Rule 20-448E, dated August 17, 2020; and (ii) IC 4-38-3-1 of Indiana Title 4 (Indiana Sports Wagering Statute).

61.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to Technical Bulletin 2020-01, dated August 6, 2020, as issued by the Michigan Gaming Control Board.

62.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to Section 287-I:7 of Title XXIV of the New Hampshire Statutes.

63.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to Section 2(m) of New Jersey Assembly Bill 4111, dated June 4, 2018.

64.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to the Pennsylvania Expanded Gaming Act, as well as Section 809.07 of Title 58 of the Pennsylvania Code.

65.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to Rule 15.1.7 (Q) of Chapter 15 of the Tennessee Sports Gaming Regulations, as promulgated by the Tennessee Education Lottery Corporation, as well as the TELC Technical Bulletin Issued August 24, 2020 relating thereto.

66.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to Section 50.1-4034 of Title 58.1, Chapter 40, of the Virginia State Code.

67.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to Section 29-22D-15 of West Virginia 2018 Senate Bill 415.

68.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to Montana House Bill 725 (2019).

69.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to Sections 22.140 and 22.145 of Regulation 22 of the Nevada Gaming Control Board.

70.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform

accepts wagers, including but not limited to Section 177-092-0025 of Chapter 177, Division 92 as promulgated by the Oregon State Lottery.

71.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the MMGG Wagering Platform accepts wagers, including but not limited to Sections 20.20(H) and 20.32 of the Rhode Island Lottery Rules and Regulations, dated December 2020.

## COUNT I
## Infringement of U.S. Patent No. 10,043,341

72.     Plaintiff incorporates the above paragraphs by reference.

73.     Defendant has been on actual notice of the '341 Patent at least as early as the date it received service of the Original Complaint in this litigation.

74.     Upon information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

75.     Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 13 of the '341 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.    Defendant directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom.    More specifically, and on information and belief, Defendant: (i) developed and maintains the infringing MMGG Domains; (ii) authored and owns the source code on which the MMGG branded Mobile Wagering Platform functions; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the

software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the MMGG branded Mobile Wagering Platform; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities. *See* Figure Groups A, B, and C. Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States. Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities. More specifically, in order to maintain legal compliance in the United States, MMGG is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use. Such testing and legal compliance necessarily requires MMGG to make and use the Accused Instrumentalities in an infringing manner. Still further, Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities. *See* Figure Group A.

76.   The Accused Instrumentalities comprise an apparatus including a computer, wherein the computer is specially programmed for processing information for providing for a placement of a bet on or regarding a sporting event. As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the MMGG branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code). Such branded Mobile Wagering Platform of MMGG is directly accessible to users in the United States

through the MMGG Domains.  On information and belief, the MMGG system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of MMGG which collectively operate as a single controlled apparatus to administer the MMGG branded Mobile Wagering Platform in the United States.  The existence of the MMGG branded Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers.  As illustrated immediately below, such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events.  Such activities comprise "processing information for providing for a placement of a bet."  *See* Figure Group C.



*See https://www.bovada.lv/sports.*

How do I make a deposit?









*See https://www.bovada.lv/help/financial-faq/how-to-deposit.*

**When will I receive my withdrawal?**

When you request a withdrawal, the funds are deducted from your account immediately.

All requests are then reviewed, in the order in which they are received and the timeframe depends on the type of request you submit.

Once approved, delivery times may vary from one withdrawal method to another. Check the estimated time frame by clicking the method on the cashier page.

If you're looking for the fastest payout, we recommend using our cryptocurrency methods. Once requested, it'll take about 24 hours for approval. Compare the time frames below:

- **Bitcoin:** Up to 24 hours from when your funds are approved.
- **Bitcoin Cash and Litecoin:** Up to 1 hour from when your funds are approved.
- **Check by Courier:** Approximately 10-15 Business Days via courier once your withdrawal is approved within 24-48 hours.

**Note:** For cryptocurrency methods, if there's congestion on the Blockchain network, higher fees may be required to complete your transaction.

If you're requesting a **Voucher**, there'll be a processing timeframe of approximately 24 hours where you'll receive your code via email.

*See https://www.bovada.lv/help/financial-faq/receive-withdrawal.*

## **FIGURE GROUP C**

77.    The aforementioned computer(s) of the Accused Instrumentalities include at least one receiver, which is configured to receive requests to notify individual users regarding the sporting event for which wagers can be placed.  More specifically, when a user logs into or accesses the infringing MMGG branded Mobile Wagering Platform via the MMGG Domains, the infringing apparatus receives a set of user credentials which serve as a request to be notified of available sporting events for which wagers can be placed.  On information and belief, once the user logs into or accesses the infringing MMGG branded Mobile Wagering Platform via the MMGG Domains, the infringing apparatus stores information regarding the request to be notified in memory.  The stored information is used, *inter alia*, to assist in designating the user as "logged in" or "logged out" of an account maintained on the MMGG branded Mobile Wagering Platform.

78.    In addition, or in the alternative, the receiver of the MMGG branded Mobile Wagering Platform is configured such that it receives incoming HTTP requests from users accessing the MMGG Domains via a web browser or application.  Such HTTP requests initiate a dynamic and interactive session with the MMGG branded Mobile Wagering Platform.  The incoming request for information is a request to be notified regarding available sporting events for which wagers

can be placed; such requests are stored and satisfied when the infringing apparatus returns page content to the user via the MMGG branded Mobile Wagering Platform.

79.     The apparatus of the Accused Instrumentalities includes a specially programmed processor, which detects postings of information regarding sporting events for which wagers can be placed and generates notification messages regarding such sporting events.  Such processor detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status.  Upon detection, the processor of the MMGG branded Mobile Wagering Platform delivers notification messages, which are reflected and take the form of updated, new, or revised data displayed via the MMGG Domains.  By way of example, the infringing processor detects the posting of updated odds for specific wagers, and thereupon generates and delivers notification messages to those who have requested such notifications via the MMGG Domains.   On information and belief, such notifications are delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the MMGG Domains, which are assembled and displayed on the communication device associated with the individual user (such as, for example, the MMGG Mobile Application on the user mobile device).  *See* Figure Groups A and C.

80.     The computer of the Accused Instrumentalities is configured to receive bet messages transmitted from the communication devices of users of the MMGG branded Mobile Wagering Platform via the MMGG Domains.   Indeed, this is the primary purpose and objective of the Accused Instrumentalities.  More specifically, the user interfaces of the MMGG Domains are specially programmed such that users can select from a menu of available sporting event wagers and

transmit such wager selections ("bet messages") via the Internet to the servers and processors of the MMGG branded Mobile Wagering Platform for fulfillment.  *See* Figure Groups A and C.

81.     On information and belief, the MMGG branded Mobile Wagering Platform requires users to provide at least one global positioning device for each communication device.  Such global positioning devices determine the physical location of such communication devices, and are essential and required by MMGG for all users of the Accused Instrumentalities; MMGG thus places the whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices.  *See* Figure Group B.  More specifically, and on information and belief, in order to make beneficial use of the MMGG branded Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed.  Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the MMGG Domains for seamless automatic installation and enablement.  In addition, and/or in the alternative, the MMGG branded Mobile Wagering Platform processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

82.     On information and belief, the MMGG branded Mobile Wagering Platform is configured such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

83.     On information and belief, the computer/processor of the MMGG branded Mobile Wagering Platform is configured such that it processes incoming bet messages for the purpose of allowing

or disallowing the wagers associated therewith.  On information and belief, as part of the regulatory compliance protocols implemented by MMGG, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

84.   The foregoing infringement on the part of MMGG has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '341 Patent.

85.   To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '341 Patent, such infringement is and will be necessarily willful and deliberate.

86.   Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

**COUNT II**
**Infringement of U.S. Patent No. 10,147,266**

87.   Plaintiff incorporates the above paragraphs by reference.

88.   Defendant has been on actual notice of the '266 Patent at least as early as the date it received service of the Original Complaint in this litigation.

89.   Upon information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

90.   Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 1 of the '266 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.   Defendant directly makes the infringing Accused

Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom.   More specifically, and on information and belief, Defendant: (i) developed and maintains the infringing MMGG Domains; (ii) authored and owns the source code on which the MMGG branded Mobile Wagering Platform functions; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the MMGG branded Mobile Wagering Platform; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities.   *See* Figure Groups A, B, and C. Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States.   Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities.   More specifically, in order to maintain legal compliance in the United States, MMGG is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use.   Such testing and legal compliance necessarily requires MMGG to make and use the Accused Instrumentalities in an infringing manner.   Still further, Defendant is a direct infringer by virtue of its branding and marketing activities which

collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities. *See* Figure Group A.

91.  The Accused Instrumentalities comprise an apparatus including a computer, wherein the computer is specially programmed for processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event.  As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the MMGG branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).  Such branded Mobile Wagering Platform of MMGG is directly accessible to users in the United States through the MMGG Domains.  On information and belief, the MMGG system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of MMGG which collectively operate as a single controlled apparatus to administer the MMGG branded Mobile Wagering Platform in the United States.  The existence of the MMGG branded Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers.  As illustrated in Figure Group C, such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events.  Such activities comprise "processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event." *See* Figure Group C.

92.  The apparatus of the Accused Instrumentalities includes a specially programmed processor, which detects postings of information regarding gaming activities, gambling activities, and/or sporting events for which wagers can be placed and generates notification messages regarding such sporting events and/or activities.  Such processor detects the posting of sporting event

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status.  Upon detection, the processor of the MMGG branded Mobile Wagering Platform delivers notification messages, which are reflected and take the form of updated, new, or revised data displayed via the MMGG Domains.  By way of example, the infringing processor detects the posting of updated odds for specific wagers, and thereupon generates and delivers notification messages via the MMGG Domains.  On information and belief, such notifications are delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the MMGG Domains ("electronic transmission"), which are received, assembled, and displayed on the communication device associated with the individual user (such as, for example, the MMGG Mobile Application on the user mobile device).  *See* Figure Groups A and C.

93.     The computer of the Accused Instrumentalities is configured to receive bet messages transmitted from the communication devices of users of the MMGG branded Mobile Wagering Platform via the MMGG Domains.  Indeed, this is the primary purpose and objective of the Accused Instrumentalities.  More specifically, the user interfaces of the MMGG Domains are specially programmed such that users can select from a menu of available sporting event wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the MMGG branded Mobile Wagering Platform for fulfillment.  *See* Figure Groups A and C.

94.     On information and belief, the MMGG branded Mobile Wagering Platform requires users to provide at least one global positioning device for each communication device.  Such global positioning devices determine the physical location of such communication devices, and are essential and required by MMGG for all users of the Accused Instrumentalities; MMGG thus places the whole infringing apparatus into service and otherwise establishes the manner of

performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices.  *See* Figure Group B.  More specifically, and on information and belief, in order to make beneficial use of the MMGG branded Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed.  Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the MMGG Domains for seamless automatic installation and enablement.  In addition, and/or in the alternative, the MMGG branded Mobile Wagering Platform processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

95.     On information and belief, the MMGG branded Mobile Wagering Platform is configured such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

96.     On information and belief, the computer/processor of the MMGG branded Mobile Wagering Platform is configured such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.  On information and belief, as part of the regulatory compliance protocols implemented by MMGG, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

97.     The foregoing infringement on the part of MMGG has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement

shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '266 Patent.

98.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '266 Patent, such infringement is and will be necessarily willful and deliberate.

99.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

**COUNT III**
**Infringement of U.S. Patent No. 10,255,755**

100.   Plaintiff incorporates the above paragraphs by reference.

101.   Defendant has been on actual notice of the '755 Patent at least as early as the date it received service of the Original Complaint in this litigation.

102.   Upon information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

103.   Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 2 of the '755 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.   Defendant directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom.   More specifically, and on information and belief, Defendant: (i) developed and maintains the infringing MMGG Domains; (ii) authored and owns the source code on which the MMGG branded Mobile Wagering Platform functions; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and

controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the MMGG branded Mobile Wagering Platform; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities.  *See* Figure Groups A, B, and C. Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States.  Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities.  More specifically, in order to maintain legal compliance in the United States, MMGG is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use.  Such testing and legal compliance necessarily requires MMGG to make and use the Accused Instrumentalities in an infringing manner.  Still further, Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities. *See* Figure Group A.

104.    The Accused Instrumentalities comprise an apparatus including a computer, wherein the computer is specially programmed to perform the function of processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event.  As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the MMGG branded Mobile Wagering Platform, which is comprised of

hardware (including servers) and software (including source code).  Such branded Mobile Wagering Platform of MMGG is directly accessible to users in the United States through the MMGG Domains.  On information and belief, the MMGG system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of MMGG which collectively operate as a single controlled apparatus to administer the MMGG branded Mobile Wagering Platform in the United States.  The existence of the MMGG branded Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers.  As illustrated in Figure Group C, such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events.  Such activities comprise a specially programmed computer for "processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event, a posting of information regarding the gaming activity, the gambling activity, or the sporting event."

105.    The apparatus of the Accused Instrumentalities includes a specially programmed processor, which is configured such that it detects and processes postings of information regarding gaming activities, gambling activities, and/or sporting events for which wagers can be placed and generates notification messages (with or using a computer) regarding such sporting events and/or activities.  More specifically, such processor is specially configured such that it detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status.  Upon detection, the processor of the MMGG branded Mobile Wagering Platform is specially programmed such that it delivers and transmits notification messages, which are reflected and take the form of

updated, new, or revised data displayed via the MMGG Domains.  By way of example, the infringing processor is programmed such that it detects the posting of updated odds for specific wagers, and thereupon generates and transmits notification messages via the MMGG Domains. On information and belief, such notifications are programmed to be transmitted and delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the MMGG Domains ("electronic transmission"), which are programmed to be received, assembled, and displayed on the communication device associated with the individual user (such as, for example, the MMGG Mobile Application on the user mobile device).  *See* Figure Groups A and C.

106.   The computer of the Accused Instrumentalities is specially programmed such that it receives bet messages transmitted from the communication devices of users of the MMGG branded Mobile Wagering Platform via the MMGG Domains.  Indeed, this is the primary purpose and objective of the Accused Instrumentalities.  More specifically, the user interfaces of the MMGG Domains are specially programmed such that users can select from a menu of available sporting event wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the MMGG branded Mobile Wagering Platform for fulfillment.  *See* Figure Groups A and C.

107.   On information and belief, the MMGG branded Mobile Wagering Platform is specially programmed such that it requires users to provide at least one global positioning device for each communication device.  Such global positioning devices determine the physical location of such communication devices, and are essential and required by MMGG for all users of the Accused Instrumentalities; MMGG thus places the whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in

the wagering opportunities upon the provision of such global positioning devices.  *See* Figure Group B.  More specifically, and on information and belief, in order to make beneficial use of the MMGG branded Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed.  Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the MMGG Domains for seamless automatic installation and enablement.  In addition, and/or in the alternative, the MMGG branded Mobile Wagering Platform is specially programmed such that it processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

108.    On information and belief, the MMGG branded Mobile Wagering Platform is specially programmed such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

109.    On information and belief, the computer/processor of the MMGG branded Mobile Wagering Platform is specially programmed such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.  On information and belief, as part of the regulatory compliance protocols implemented by MMGG, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

110.    The foregoing infringement on the part of MMGG has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement

shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '755 Patent.

111.   To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '755 Patent, such infringement is and will be necessarily willful and deliberate.

112.   Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

**COUNT IV**
**Infringement of U.S. Patent No. 9,965,920**

113.   Plaintiff incorporates the above paragraphs by reference.

114.   Defendant has been on actual notice of the '920 Patent at least as early as the date it received service of the Original Complaint in this litigation.

115.   Upon information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

116.   Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 16 of the '920 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.   Defendant directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom.   More specifically, and on information and belief, Defendant: (i) developed and maintains the infringing MMGG Domains; (ii) authored and owns the source code on which the MMGG branded Mobile Wagering Platform functions; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and

controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the MMGG branded Mobile Wagering Platform; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities.   *See* Figure Groups A, B, and C. Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States.   Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities.   More specifically, in order to maintain legal compliance in the United States, MMGG is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use.   Such testing and legal compliance necessarily requires MMGG to make and use the Accused Instrumentalities in an infringing manner.   Still further, Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities. *See* Figure Group A.

117.    The Accused Instrumentalities comprise an apparatus including a computer, wherein the computer is specially programmed for processing information for providing for a placement of a bet on or regarding a sporting event.   As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the MMGG branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).   Such

branded Mobile Wagering Platform of MMGG is directly accessible to users in the United States through the MMGG Domains.  On information and belief, the MMGG system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of MMGG which collectively operate as a single controlled apparatus to administer the MMGG branded Mobile Wagering Platform in the United States.  The existence of the MMGG branded Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers.  As illustrated in Figure Group C, such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events.

118.   The apparatus of the Accused Instrumentalities includes a specially programmed processor, which detects postings of information regarding sporting events for which wagers can be placed via the Internet, and generates notification messages regarding such sporting events.  More specifically, such processor is specially programmed such that it detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status.  Upon detection, the processor of the MMGG branded Mobile Wagering Platform is specially programmed such that it transmits and delivers notification messages, which are reflected and take the form of updated, new, or revised data displayed via the MMGG Domains.  By way of example, the infringing processor is specially programmed such that it detects the posting of updated odds for specific wagers, and thereupon generates and delivers notification messages via the MMGG Domains.  On information and belief, such notifications are delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the MMGG Domains, which are

received, assembled, and displayed on the communication device associated with the individual user (such as, for example, the MMGG Mobile Application on the user mobile device).  *See* Figure Groups A and C.

119.   The computer of the Accused Instrumentalities is specially configured to receive bet messages transmitted from the communication devices of users of the MMGG branded Mobile Wagering Platform via the MMGG Domains.  Indeed, this is the primary purpose and objective of the Accused Instrumentalities.  More specifically, the user interfaces of the MMGG Domains are specially programmed such that users can select from a menu of available sporting event wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the MMGG branded Mobile Wagering Platform for fulfillment. *See* Figure Groups A and C.

120.   On information and belief, the MMGG branded Mobile Wagering Platform requires users to provide at least one global positioning device for each communication device.  Such global positioning devices determine the physical location of such communication devices, and are essential and required by MMGG for all users of the Accused Instrumentalities; MMGG thus places the whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices.  *See* Figure Group B.  More specifically, and on information and belief, in order to make beneficial use of the MMGG branded Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed.  Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the MMGG Domains for seamless

automatic installation and enablement.  In addition, and/or in the alternative, the MMGG branded Mobile Wagering Platform processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

121.  On information and belief, the MMGG branded Mobile Wagering Platform is configured such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

122.  On information and belief, the computer/processor of the MMGG branded Mobile Wagering Platform is configured such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.  On information and belief, as part of the regulatory compliance protocols implemented by MMGG, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

123.  On information and belief, the Accused Instrumentalities further comprise video recording and/or video conferencing devices which are configured to obtain and/or record live video information regarding the sporting events for which wagers can be placed.  The Accused Instrumentalities further comprise transmitters, which are programmed so as to transmit such video information to users of the infringing system via the MMGG Domains.  On information and belief, such video information is transmitted and delivered to users when the computer of the infringing apparatus initiates a communication link with the browser via the MMGG Domains, which are received, assembled, and displayed on the communication device associated with the

individual user (such as, for example, the MMGG Mobile Application on the user mobile device) in the form of game highlights.  *See* Figure Groups A, C, and D.



*See https://www.bovada.lv/sports/virtual-sports.*

---

## Basketball

At the time of writing, I've watched 15 consecutive basketball games in the "American Basketball League" though, they admittedly don't take very long to resolve. A new game starts every four minutes.

Each contest shows the simulated players competing in a handful of plays, while announcers call the action. The visual effects are surprisingly well done and feature a wide variety of plays, from deep threes to the occasional "Vince Carter" elbow dunk. After showing a few highlights, Bovada posts the halftime and final scores.

What's brilliant is that there's a real handicapping element to betting on these virtual basketball games. The website has created an entire league, with official standings and stats that appear to impact the results.

---

*See         https://www.legitgamblingsites.com/blog/examining-bovadas-live-numbers-games-and-virtual-sports/*

### **FIGURE GROUP D**

124.    The foregoing infringement on the part of MMGG has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement

shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '920 Patent.

125.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '920 Patent, such infringement is and will be necessarily willful and deliberate.

126.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Beteiro, LLC respectfully requests the Court enter judgment against Defendant as follows:

1.      Declaring that Defendant has infringed each of the Asserted Patents;

2.      Awarding Beteiro, LLC its damages suffered because of Defendant's infringement of the Asserted Patents;

3.      Awarding Beteiro, LLC its costs, reasonable attorneys' fees, expenses, and interest;

4.      Granting a permanent injunction pursuant to 35 U.S.C. § 283, enjoining Defendants from further acts of infringement with respect to the Asserted Patents;

5.      Awarding Beteiro, LLC ongoing post-trial royalties for infringement of the non-expired Asserted Patents; and

6.      Granting Beteiro, LLC such further relief as the Court finds appropriate.

**JURY DEMAND**

Beteiro, LLC demands trial by jury, under Fed. R. Civ. P. 38.

Dated:  November 8, 2021                    Respectfully Submitted

                                            */s/ M. Scott Fuller*
                                            M. Scott Fuller
                                                Texas Bar No. 24036607
                                                sfuller@ghiplaw.com
                                            Randall Garteiser
                                                Texas Bar No. 24038912
                                                rgarteiser@ghiplaw.com

                                            **GARTEISER HONEA, PLLC**
                                            119 W. Ferguson Street
                                            Tyler, Texas 75702
                                            Telephone: (903) 705-7420

                                            **ATTORNEYS FOR PLAINTIFF
                                            BETEIRO, LLC**

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    56